**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| URBAJET SARLAU,<br>Lotissement Attaoufik No. 16-18,<br>Sidi Maarouf Casablanca, Kingdom of Morocco,<br>*Petitioner*,<br><br>v.<br><br>THE REPUBLIC OF EQUATORIAL GUINEA,<br>Via Ministerial Malabo 2<br>Republic of Equatorial Guinea,<br><br>*Respondent*. | Case No. 1:26-cv-03663 |

**PETITION TO RECOGNIZE AND ENFORCE A FOREIGN ARBITRAL AWARD**

WHITE & CASE
Nicolle Kownacki (D.C. Bar No. 1005627)
Mitchell Hightower (D.C. Bar No. 90029631)
Sydney Robson (D.C. Bar No. 90038636)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
nkownacki@whitecase.com
mitchell.hightower@whitecase.com
sydney.robson@whitecase.com

October 20, 2026

*Counsel for Urbajet Sarlau*

**OVERVIEW**

1. Petitioner Urbajet Sarlau ("Urbajet" or the "Petitioner"), by and through its undersigned counsel, hereby submits this petition to recognize and enforce a foreign arbitral award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"), as statutorily enacted by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201, 207. Specifically, Urbajet seeks recognition and enforcement of a final, binding arbitration award (the "Award") dated November 21, 2025, which was notified by the ICC Secretariat on November 25, 2025, in case No. 27340/SP/AJP/ETT/SVE, administered by the International Chamber of Commerce ("ICC") seated in Paris, France, after a full and fair process in compliance with the Rules of Arbitration of the ICC in force since January 1, 2021.

2. A true and correct certified copy of the Award is attached as **Exhibit 1** to the Declaration of Nicolle Kownacki in Support of Petition to Confirm Foreign Arbitral Award ("Kownacki Decl."). Also attached thereto is a true and correct certified copy of the arbitral agreement, which is contained at Article 41 of Contract No. 66/05 for the Construction of Two Thousand (2000) Social Housing Dwellings (the "Contract," attached as **Exhibit 2** to the Declaration of Nicolle Kownacki). Certified English translations of both documents are provided.

3. Pursuant to the arbitral Tribunal's findings as stated in the Award, Urbajet was justified in terminating the Contract due to breaches by the Republic of Equatorial Guinea ("Equatorial Guinea") that prevented the completion of works for which Urbajet was contracted, and Equatorial Guinea is liable on several grounds for damages of over €102,700,867[1], plus

[1] This figure consists of the aggregate sum of the principal awarded by the Tribunal as well as the portion of the pre-Award interest calculated by the Tribunal as set forth in Award ¶¶ 542(ii)-(iii).

€992,859.02 in arbitration costs and all interest due under Award, or otherwise provide by law, as further described below. As of the present date, Equatorial Guinea has not paid any part of the Award.

**THE PARTIES**

4. Urbajet is a company incorporated under Moroccan law and specializing in project management and construction of real estate projects. Its registered office is in Casablanca in the Kingdom of Morocco.

5. Equatorial Guinea is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1603(a).

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this proceeding under the FSIA, 28 U.S.C. § 1330(a)-(b), as this is an action against a foreign state.

7. Personal jurisdiction over Equatorial Guinea will exist upon service pursuant to 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b).

8. Subject-matter jurisdiction exists, because Equatorial Guinea does not enjoy sovereign immunity from the jurisdiction of this Court. *See* 28 U.S.C. § 1330(a). Specifically, the FSIA's "arbitration exception" applies to this action, because Petitioner seeks to "confirm an award made pursuant to . . . an agreement to arbitrate" (*i.e.*, the Contract) and the Award is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards" (*i.e.*, the New York Convention). 28 U.S.C. § 1605(a)(6); *see also NextEra v. Spain*, 112 F. 4th 1088, 1099 (D.C. Cir. 2024) ("To proceed under this clause of the FSIA's arbitration exception . . . a district court must find three 'jurisdictional facts': (1) an arbitration agreement, (2), an arbitration award, and (3) a treaty

potentially governing award enforcement." (citing *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 & n.2)). The New York Convention, which is incorporated into Chapter 2 of the Federal Arbitration Act ("FAA"), is a treaty in force in the United States providing for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Here, the Award was made in Paris, France, the place (or "seat") of the arbitration.

9. This Court also has jurisdiction over this proceeding under 9 U.S.C. § 203, which provides that "[t]he district courts of the United States . . . shall have original jurisdiction" over actions and proceedings under the New York Convention.

10. Venue is proper in this Court because, under the FSIA, a civil action may be brought "in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4).

## LEGAL STANDARDS

11. As noted above, enforcement of the Award is subject to and governed by the New York Convention, which applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention, Art. I(1); *see also* 9 U.S.C. § 201 (implementing the New York Convention).

12. Under the New York Convention, a court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). "Given that the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation

proceedings are generally summary in nature." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) (confirming arbitral award).

**THE DISPUTE**

13. In March 2006, Urbajet and Equatorial Guinea entered into the Contract, which pertained to the design and construction of 2,000 social housing units by Urbajet within Equatorial Guinea (the "Project"). The Project entailed two sub-projects: one for the design and construction of 1,000 housing units in the city of Malabo and another for 1,000 housing units in the city of Bata. The initial contract price was for 44.3 billion CFA francs[2] (for reference, then approximately US$ 81 million). Award ¶¶ 2, 29.

14. The Contract contained at Article 41 the dispute resolution provision, which encompassed the parties' agreement to arbitrate:

> In case of dispute, the parties shall meet to obtain an amicable solution; if this is not achieved, they will submit to arbitration by the International Chamber of Commerce of Paris.

15. The Project began to face difficulties in September 2006, about six months after the parties entered into the Contract. Urbajet began to face significant unforeseen challenges, including the unsuitability of the allocated land for construction, the need for deforestation of the area, and the occupation of the land by third parties. As a result, Urbajet was unable to commence work in certain areas. Award ¶¶ 35–37.

---

[2] The CFA franc (XAF) is a currency used by the Economic and Monetary Community of Central Africa (CEMAC) member states, including Equatorial Guinea. It is pegged to the euro and currently guaranteed by the French treasury. The CFA franc is subject to a fixed parity with the euro at the rate of €1 = 655.957 CFA francs. *See CFA franc*, United Nations Terminology Database, https://unterm.un.org/unterm2/en/view/6c11813d-f658-473c-a971-8945a4e8debc.

16. In May 2011, the Contract was modified by way of a service order for additional work, and further additional work was approved in 2013 and 2017, bringing the total contract price to 205.3 billion CFA francs (then approximately US$ 450 million). *Id.* ¶¶ 38–41.

17. Despite Urbajet's performance of its obligations under the Contract, Equatorial Guinea repeatedly failed to make timely or full payments for the works executed, ignored Urbajet's contractual entitlement to price adjustments, and failed to fulfill its obligation to make the project sites available free of third-party occupants. *Id.* ¶¶ 280–85. Equatorial Guinea also at certain points unilaterally suspended aspects of the Project. *Id.* ¶¶ 241, 323. Between 2016 and 2020, Urbajet sent multiple letters regarding the technical and financial difficulties encountered during the Project. Urbajet's letters also sought payment from Equatorial Guinea and warned Equatorial Guinea of the detrimental consequences of delays on the Project's cashflow. Equatorial Guinea did not respond to any of these letters. *Id.* ¶¶ 281, 319.

18. Urbajet also incurred losses as a result of Equatorial Guinea's failure to release a deposit repayment guarantee. In August 2006, Equatorial Guinea paid Urbajet an advance payment in the amount of 17,720,000,000 CFA francs, 40% of the contract price at the time. As a condition for receiving the advance, Urbajet provided Equatorial Guinea with a deposit repayment guarantee through Crédit Immobilier et Hôtelier (CIH Bank), equal to the amount of the advance. CIH Bank, in turn, obligated Urbajet to place half of the advance in escrow. Due to the delays on the Project caused by Equatorial Guinea's breaches, Urbajet had to repeatedly extend and maintain the guarantee, which generated additional maintenance fees while the escrowed funds remained inaccessible. *Id.* ¶¶ 403–05. Although the deposit repayment guarantee would have been fully amortized by the contractual completion date in 2010 had the works progressed normally, the advance payment was in any event fully amortized through the executed works as of

December 31, 2016, when the amount of the works executed exceeded the payments made by Equatorial Guinea to Urbajet, including the payment of the launch advance. Equatorial Guinea nevertheless refused to release the guarantee. *Id.* ¶¶ 470–73.

19. On May 18, 2021, Urbajet wrote to Equatorial Guinea seeking a solution for the impasse. *Id.* ¶ 319. Urbajet's letter summarized the various problems, including repeated scope changes, land occupation by third parties, non-application of the contractual price revision mechanism, and late payment of interim statements, and set out conditions for the resumption of work. *Id.*

20. On September 14, 2022, Urbajet sought to terminate the Contract and sent a formal notice of termination pursuant to Article 34 of the Contract. Urbajet requested payment within 15 days of the outstanding sum of 62.1 billion CFA francs (approximately US$ 94.6 million). *Id.* ¶ 321. Urbajet stated that, should the parties fail to reach an amicable resolution, Urbajet would initiate arbitration proceedings. *Id.* Equatorial Guinea provided no response within the 15-day period, and Urbajet therefore commenced arbitration proceedings by filing a Request for Arbitration on October 28, 2022. *Id.* ¶ 46–47, 322.

21. The arbitration was conducted under the 2021 Rules of the International Chamber of Commerce ("ICC Rules") and was seated in Paris, France. The ICC confirmed the appointment of José Manuel García Represa by Urbajet and Javier Fernández-Samaniego by Equatorial Guinea, as co-arbitrators. *Id.* ¶¶ 81–82. On June 22, 2023, the ICC appointed Luiz Aboim as President of the Tribunal. *Id.*

22. Throughout the arbitration, both parties had a full opportunity to be heard and were subject to fair proceedings. Both parties were represented by counsel. *Id.* ¶¶ 5–8. Urbajet submitted its Statement of Claim on September 29, 2023. *Id.* ¶ 102. Equatorial Guinea submitted

its Statement of Defense on January 9, 2024, in which it raised jurisdictional objections, declined to raise merits defenses, and requested bifurcation of the proceedings (a request that was ultimately rejected by the Tribunal). *Id.* ¶ 110, 250–51. Urbajet thereafter submitted its Statement of Reply on March 22, 2024, addressing Equatorial Guinea's jurisdictional objections. *Id.* ¶ 117. Equatorial Guinea did not submit a rejoinder as it was entitled to by the Tribunal's established procedure, but filed further objections to the jurisdiction of the Tribunal on June 14, 2024. *Id.* ¶¶ 118–20.

23. The final hearing took place in Paris on October 2–3, 2024. *Id.* ¶ 129. Both parties participated. *Id.* ¶ 130. Equatorial Guinea submitted its post-hearing brief on November 18, 2024, and Urbajet submitted its post-hearing brief on November 22, 2024. *Id.* ¶ 139.

24. The Tribunal's final Award is dated November 21, 2025, and it was formally notified by the ICC Secretariat on November 25, 2025. In the Award, the Tribunal found Equatorial Guinea's jurisdictional objections to be admissible but ultimately rejected them, holding that the Tribunal had jurisdiction to hear the dispute. *Id.* ¶¶ 183–248.

25. With regard to the merits, although Equatorial Guinea chose not to pursue any counterclaims or merits defenses, the Tribunal nevertheless assessed the lawfulness and evidentiary support of Urbajet's claims before ruling mostly in Urbajet's favor. *Id.* ¶ 252–53. In particular:

a. The Tribunal found that Urbajet was justified in terminating the Contract due to payment defaults and other breaches by Equatorial Guinea preventing Urbajet's completion of works. The Tribunal noted in particular Equatorial Guinea's failure to release the land, the occupation of the land by third parties, and Equatorial Guinea's temporary suspension of works on both sub-projects. *Id.* ¶ 323.

b. The Tribunal accepted Urbajet's argument that it was entitled to unpaid amounts for the value of works executed, as well as interest on both belatedly paid and unpaid amounts. *Id.* ¶ 348–50, 362–65.

c. The Tribunal accepted Urbajet's argument that, due to changes in the economic conditions of Equatorial Guinea, the price of the works established in 2006 had risen and Urbajet was entitled to an adjusted price. Absent any competing calculations put forward by Equatorial Guinea, the Tribunal adopted Urbajet and its appointed expert's calculations for price adjustment. *Id.* ¶¶ 377–81.

d. The Tribunal found Urbajet's calculation of lost profits to be reasonable, and accepted Urbajet and its appointed expert's calculations, absent any competing calculations put forward by Equatorial Guinea. *Id.* ¶¶ 395–99.

e. The Tribunal accepted Urbajet's claim that it was entitled to damages related to the losses incurred from maintaining the deposit repayment guarantee with CIH Bank. The Tribunal also held that Equatorial Guinea must release the deposit repayment guarantee issued through CIH Bank, finding that the principal obligation guaranteed by that guarantee had been fully extinguished. *Id.* ¶¶ 417–19, 479.

f. The Tribunal, upon review of Claimant's evidence including an expert report modeling costs, accepted Urbajet's argument that Equatorial Guinea's conduct had caused considerable additional operating costs, and deemed these costs to be recoverable from Equatorial Guinea. *Id.* ¶ 463.

The Tribunal denied Urbajet's request for the Tribunal to order Urbajet be held "harmless" from (in other words, not liable for) any sum that it may be ordered to pay pursuant to rulings of the courts or administrative proceedings of Equatorial Guinea. *Id.* ¶¶ 481–87.

26. The Tribunal awarded Urbajet the following euro-denominated amounts as principal: (a) €8,753,000 for unpaid works; (b) €7,160,000 for Contract price adjustment; (c) €46,727,000 for loss of profit; (d) €758,000 for costs related to maintaining the deposit repayment guarantee; (e) €2,407,348 for additional operating costs. *Id.* ¶ 542.

27. Adopting the formulas for interest as provided by Urbajet's quantum expert in the arbitration, FTI Consulting, the Tribunal also awarded pre-Award interest on those amounts (a) through (e) to run to the date of notification of the Award (November 25, 2025). *See id.* ¶¶ 363–65, 379–81, 400–02, 419–22, 463–65, 501, 509–10, 512, 542(ii)-(iii). With respect to sum (a), the pre-Award interest awarded includes interest on both unpaid works and works paid late, consistent with FTI's formulas as adopted by the Tribunal. *See id.* ¶¶ 363–65. The Tribunal provided exemplar calculations of pre-Award interest awarded. For sums (a) through (d), the Tribunal provided pre-Award interest calculations relying on FTI's calculations through September 30, 2024. *Id.* ¶ 542. For sum (e), the Tribunal provided a pre-Award interest calculation relying on FTI's calculation through September 20, 2023. *Id.*; *id.* ¶ 464.

28. Attached as **Exhibit 3** to the Declaration of Nicolle Kownacki is a table setting forth the principal amounts awarded along with a calculation of pre-Award interest through November 25, 2025, relying on FTI's formulas as adopted by the Tribunal, for a total of damages and interest owed as of November 25, 2025, of €109,829,160.26.

29. The Tribunal further ordered Equatorial Guinea to pay post-Award interest on the above sums (a)-(e), duly updated with all pre-Award interest and converted into euros at the date of the Arbitral Award, at the 12-month EURIBOR rate plus 2%, compounded annually, running from the 15th day following notification of the Award. *Id.* ¶ 542.

30. The Tribunal also awarded Urbajet €992,859.02 in arbitration costs, payable by Equatorial Guinea. *Id.*

31. To date, no payment has been made to Urbajet on the Award. Kownacki Decl. ¶ 7.

32. The Award was granted exequatur (*i.e.*, recognition) at the seat of arbitration on February 26, 2026, by the Tribunal Judiciaire de Paris. *See* Kownacki Decl. **Ex. 4**. Urbajet is currently in the process of diplomatically notifying Equatorial Guinea of the grant of exequatur at the seat. Kownacki Decl. ¶ 5.

33. Petitioner is seeking recognition and enforcement of the Award concurrently in the Kingdom of Spain and in the United Kingdom. Should the Award be recognized and enforced in either of those jurisdictions, Petitioner will promptly notify the Court of such recognition, as well as any collections on the Award. Kownacki Decl. ¶ 6. Petitioner is not aware of any application by Equatorial Guinea to set aside or suspend enforcement of the Award.

## GROUNDS FOR RECOGNITION AND ENFORCEMENT

34. The arbitration agreement set forth in Article 41 of the Contract (Kownacki Decl. Ex. 2) and described herein at paragraphs 13–14 constitutes an "agreement in writing" for the purposes of Article II of the New York Convention.

35. The Award was made in France, a country that is party to the New York Convention, and which is a country other than the country in which recognition and enforcement is sought. The United States is also a party to the New York Convention.

36. The Award is final and binding within the meaning of the New York Convention and Chapter 2 of the FAA.

37. None of the grounds for refusal or deferral of recognition and enforcement of the Award are applicable, including because the Award was the result of a full and fair process

pursuant to a valid arbitration agreement and the Award has not been set aside or suspended by a competent authority at the seat of the arbitration.

38. In the absence of any ground upon which to refuse enforcement, the obligations contained within the New York Convention and the FAA require that the Award be recognized and enforced, with all interest awarded or otherwise due under the Award, pursuant to the New York Convention and 9 U.S.C. § 207.

39. As regards interest, the Award specifies the applicable rates of pre- and post-Award interest, and Petitioner requests that judgment be entered in such amounts.

40. In addition, Petitioner is entitled to post-judgment interest. *See* 28 U.S.C. § 1961. Accordingly, Petitioner requests that the judgment specify that post-judgment interest shall accrue on all of the sums specified in the Award, as provided by law, until the payment in full of the sums due.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that, pursuant to Article III of the New York Convention and 9 U.S.C. § 207, this Court:

1. Enter an order recognizing and enforcing the Award;
2. Enter judgment for Petitioner and against Respondent recognizing the Award and entering judgment in an amount equal to the full value of the Award, converted to U.S. dollars according to the exchange rate appropriate at that time,[3] *i.e.*:

[3] *See, e.g., Eurofinsa, S.A. v. Gabonese Republic*, No. 23-3013 (RC), 2025 U.S. Dist. LEXIS 106063, at *13 (D.D.C. Jan. 17, 2025) ("If the foreign currency has depreciated since the injury or breach, judgment is typically given at the rate of exchange applicable on the date of injury or breach. If the foreign currency has appreciated since the date of the breach, judgment is typically given at the rate of exchange applicable on the date of judgment."). Prior to entry of judgment, Petitioner would be pleased to provide the Court with a table calculating total damages, accrued interest, arbitration costs, and U.S. dollar conversions as of the anticipated date of final judgment.

a. €8,753,000 in unpaid works;

b. €7,160,000 for Contract price adjustment;

c. €46,727,000 for loss of profit;

d. €758,000 for costs related to maintaining the deposit repayment guarantee;

e. €2,407,348 for additional operating costs;

f. All pre-Award interest on sums (a)-(e), calculated in accordance with the Tribunal's decision at paragraph 542(ii)-(iii) of the Award, so that the pre-Award interest components run to the date of notification of the Award.[4]

g. Interest on the above sums (a)-(f), calculated in accordance with the Tribunal's decision at paragraphs 542(ii)-(iii) of the Award, at the 12-month EURIBOR rate plus 2%, compounded annually, running from the 15th day following notification of the Award by the ICC Secretariat until the payment in full of the sums due; and

h. €992,859.02 in arbitration costs.

3. Enter an order recognizing and enforcing the Tribunal's order requiring Respondent to release the CIH Bank deposit repayment guarantee;

4. Order Respondent to bear the costs of this proceeding; and

5. Grant such other relief as the Court may deem just and proper.

---

[4] As noted above, Urbajet (relying on the calculations of FTI, its quantum expert in the arbitration) has performed the calculation of pre-Award interest, producing a total figure including principal of €109,829,160.26 owed through November 25, 2025. *See* Kownacki Decl. **Ex. 3**.

Dated: October 20, 2026
Washington, D.C.

Respectfully submitted,

WHITE & CASE

/s/ *Nicolle Kownacki*
Nicolle Kownacki (D.C. Bar No. 1005627)
Mitchell Hightower (D.C. Bar No. 90029631)
Sydney Robson (D.C. Bar No. 90038636)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
nkownacki@whitecase.com
mitchell.hightower@whitecase.com
sydney.robson@whitecase.com

*Counsel for Urbajet Sarlau*